# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIC M. BEAVIN, Administrator of the Estate of Annette Blazin-Beavin, deceased, in his own right and on behalf of said Decedent's Next-of-Kin and Heirs-at-Law; AND WILLIAM BEAVIN, in his own right, <br><br> *Plaintiffs*, <br><br> v. <br><br> THE WILLIAM W. BACKUS HOSPITAL; BACKUS CORPORATION; HARTFORD HOSPITAL; HARTFORD HEALTHCARE CORPORATION; HARTFORD HEALTHCARE MEDICAL GROUP, INC.; UNITED COMMUNITY AND FAMILY SERVICES, INC.; GEETHA R. SWAMY IYAH, MD; ALFRED CAUDULLO, DO; INDRAMATTIE JOSEPH, PA; AND PAUL J. SCHWARTZ, MD, <br><br> *Defendants* | Case No.  *21-cv-579* |

## WRONGFUL DEATH AND MEDICAL MALPRACTICE – CIVIL COMPLAINT

### JURISDICTION

1. This Court has jurisdiction over Plaintiffs' claim under the Federal Torts Claim Act due to the fact that two of the defendants – United Community and Family Services, Inc. ("UCFS") and Geetha R. Swamy Iyah, M.D. ("Dr. Iyah") – were employees of the public health service. Additionally, this Court has Supplemental Jurisdiction pursuant to 28 U.S. Code § 1367. This claim is in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

2. Prior to the filing of this Complaint, Plaintiff has exhausted all administrative remedies under the FTCA. *See* Exhibit A.

### NATURE OF THE CASE

3. Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

4.  This is a catastrophic personal injury case stemming from the negligence of Defendants in failing to provide appropriate medical care to Plaintiffs' Decedent, Annette Blazin-Beavin.

### DEMAND FOR JURY

5.  Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

6.  Plaintiffs hereby demand a jury trial on all issues so triable.

### PARTIES

7.  Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

8.  Plaintiff, Eric M. Beavin, Administrator of the Estate of Annette Blazin-Beavin, Deceased, is the widow of Annette Blazin-Beavin and resides at 220 Maple Ave, PO Box 94, Uncasville, CT 06382.

9.  On November 27, 2018, Plaintiff, Eric M. Beavin, was appointed Administrator of the Estate of Annette Blazin-Beavin by the Niantic Regional Probate Court. *See* Exhibit B.

10. Plaintiff, William Beavin, is the son of Decedent, Annette Blazin-Beavin, and resides at 220 Maple Ave, PO Box 94, Uncasville, CT 06382 with a date of birth of August 28, 2002.

11. At all times mentioned herein and relevant hereto, the defendant, THE WILLIAM W. BACKUS HOSPITAL ("Backus Hospital"), was a professional corporation, medical institution, facility, other entity, and/or subsidiary of defendants, Hartford Healthcare Corporation and/or Backus Corporation, organized and existing under the laws of the State of Connecticut, and was comprised of physicians, physician-assistants, registered nurses, and other healthcare providers with its principal place of business at 326 Washington St, Norwich, CT 06360 and its environs.

12. At all times mentioned herein and relevant hereto, the defendant, BACKUS CORPORATION, was a professional corporation, medical institution, facility, other entity, and/or subsidiary of defendant, Hartford Healthcare Corporation, organized and existing under the laws of the State of Connecticut, is the agent of defendant, Backus Hospital, and was comprised of physicians, physician-assistants, registered nurses, and other health care providers with its principal place of business at 326 Washington St, Norwich, CT 06360 and its environs.

13. At all times mentioned herein and relevant hereto, the defendant, HARTFORD HOSPITAL, was a professional corporation, medical institution, facility, other entity, and/or subsidiary of defendant, Hartford Healthcare Corporation, organized and existing under the laws of the State of Connecticut, and was comprised of physicians, physician-assistants, registered nurses, and other health care providers with its principal place of business at 80 Seymour Street Hartford, CT 06102 and its environs.

14. At all times mentioned herein and relevant hereto, the defendant, HARTFORD HEALTHCARE CORPORATION, was a professional corporation, medical institution, facility, and/or other entity organized and existing under the laws of the State of Connecticut, was the agent of defendants, Hartford Hospital and/or Backus Corporation and/or Backus Hospital, and was comprised of employees including but not limited to physicians, physician-assistants, registered nurses, and other health care providers with its principal place of business at One State Street, Suite 19, Hartford, CT 06103 and its environs.

15. At all times mentioned herein and relevant hereto, the defendant, HARTFORD HEALTHCARE MEDICAL GROUP, INC (hereinafter referred to as "HHMG"), was a professional corporation, medical institution, facility, and/or other entity organized and

existing under the laws of the State of Connecticut, was the agent of defendants, Hartford Hospital and/or Hartford Healthcare Corporation, and was comprised of employees including but not limited to physicians, physician-assistants, registered nurses, and other health care providers with its principal place of business at 80 Seymour Street, Hartford, CT 06102 and its environs.

16. At all times mentioned herein and relevant hereto, the defendant, UNITED COMMUNITY AND FAMILY SERVICES, INC. (hereinafter referred to as "UCFS"), was a professional corporation, medical institution, facility, and/or other entity organized and existing under the laws of the State of Connecticut, was the agent of defendants, Hartford Hospital and/or Hartford Healthcare Corporation and/or Backus Corporation and/or Backus Hospital, and was comprised of employees including but not limited to physicians, physician-assistants, registered nurses, and other health care providers with its principal place of business at 47 Town Street, Norwich, CT 06360 and its environs.

17. At all times mentioned herein and relevant hereto, the defendant, GEETHA R. SWAMY IYAH, MD (hereinafter referred to as "Dr. Iyah"), was a duly licensed and board-certified internal medicine physician, who at all relevant times mentioned herein, and material hereto, practiced medicine at 47 Town Street, Norwich, CT 06360 and its environs.

18. At all times mentioned herein and relevant hereto, Dr. Iyah represented herself to be a competent, skillful, and qualified physician specializing in the field of internal medicine and specially certified and/or qualified to practice, attend, treat, and administer medical care and treatment upon and to patients, such as Plaintiffs' Decedent, Annette Blazin-Beavin.

19. A physician/patient and/or healthcare provider/patient relationship existed between Plaintiffs' Decedent, Annette Blazin-Beavin, and Dr. Iyah for a period of time, including the time of the occurrences as described hereinafter.

20. At all times mentioned herein and relevant hereto, Dr. Iyah was engaged in the practice of medicine and was obliged to bring to bear in the practice of her profession the professional skill, knowledge, and care which she possessed, and to pursue her profession in accordance with reasonably safe standards of medicine.

21. At all times mentioned herein and relevant hereto. Dr. Iyah was acting as an agent and/or employee of defendants, Backus Hospital, Backus Corporation, Hartford Healthcare Corporation and/or United Community and Family Services, Inc., and as such defendants, Backus Hospital, Backus Corporation, Hartford Healthcare Corporation and/or United Community and Family Services, Inc., are liable for Dr. Iyah's actions under theory(ies) of agency, ostensible agency, apparent agency, respondeat superior, and/or vicarious liability.

22. At all times mentioned herein and relevant hereto, the defendant, ALFRED CAUDULLO, DO (hereinafter referred to as "Dr. Caudullo"), was a duly licensed and board-certified emergency medicine physician, who at all relevant times mentioned herein, and material hereto, practiced medicine at 326 Washington St, Norwich, CT 06360 and its environs.

23. At all times mentioned herein and relevant hereto, Dr. Caudullo represented himself to be a competent, skillful, and qualified physician specializing in the field of emergency medicine and specially certified and/or qualified to practice, attend, treat, and administer medical care and treatment upon and to patients, such as Plaintiffs' Decedent, Annette Blazin-Beavin.

24. A physician/patient and/or healthcare provider/patient relationship existed between Plaintiffs' Decedent, Annette Blazin-Beavin, and Dr. Caudullo for a period of time, including the time of the occurrences as described hereinafter.

25. At all times mentioned herein and relevant hereto, Dr. Caudullo was engaged in the practice of medicine and was obliged to bring to bear in the practice of his profession the professional skill, knowledge, and care which he possessed, and to pursue his profession in accordance with reasonably safe standards of medicine.

26. At all times mentioned herein and relevant hereto. Dr. Caudullo was acting as an agent and/or employee of defendants, Hartford Healthcare Corporation, Backus Corporation, and/or Backus Hospital, and as such defendants, Hartford Healthcare Corporation, Backus Corporation, and/or Backus Hospital, are liable for Dr. Caudullo's actions under theories of agency, ostensible agency, apparent agency, respondeat superior, and/or vicarious liability.

27. At all times mentioned herein and relevant hereto, the defendant, INDRAMATTIE JOSEPH, PA (hereinafter referred to as "PA Joseph"), was a duly licensed physician's assistant, who at all relevant times mentioned herein, and material hereto, practiced medicine at 80 Seymour Street, Hartford, CT 06102 and its environs.

28. At all times mentioned herein and relevant hereto, PA Joseph represented herself to be a competent, skillful, and qualified physician's assistant specializing in the field of neurosurgery and specially certified and/or qualified to practice, attend, treat, and administer medical and/or surgical care and/or treatment upon and to patients, such as Plaintiffs' Decedent, Annette Blazin-Beavin.

29. A physician/patient and/or healthcare provider/patient relationship existed between Plaintiffs' Decedent, Annette Blazin-Beavin, and defendant, PA Joseph, for a period of time, including the time of the occurrences as described hereinafter.

30. At all times mentioned herein and relevant hereto, PA Joseph was engaged in the practice of medicine and was obliged to bring to bear in the practice of his profession the professional skill, knowledge, and care which he possessed, and to pursue his profession in accordance with reasonably safe standards of medicine.

31. At all times mentioned herein and relevant hereto. PA Joseph was acting as an agent and/or employee of defendants, Hartford Hospital and/or Hartford Healthcare Corporation and/or Hartford Healthcare Medical Group, Inc., and as such defendants, Hartford Hospital and/or Hartford Healthcare Corporation and/or Hartford Healthcare Medical Group, Inc., are liable for PA Joseph's actions under theor(ies) of agency, ostensible agency, apparent agency, respondeat superior, and/or vicarious liability.

32. At all times mentioned herein and relevant hereto, the defendant, PAUL J. SCHWARTZ, MD (hereinafter referred to as "Dr. Schwartz"), was a duly licensed and board-certified neurosurgeon, who at all relevant times mentioned herein, and material hereto, practiced medicine at 80 Seymour Street, Hartford, CT 06102 and its environs.

33. At all times mentioned herein and relevant hereto, Dr. Schwartz represented himself to be a competent, skillful, and qualified physician specializing in the field of neurosurgery and specially certified and/or qualified to practice, attend, treat, and administer medical care and treatment upon and to patients, such as Plaintiffs' Decedent, Annette Blazin-Beavin.

34. A physician/patient and/or healthcare provider/patient relationship existed between Plaintiffs' Decedent, Annette Blazin-Beavin, and Dr. Schwartz for a period of time, including the time of the occurrences as described hereinafter.

35. At all times mentioned herein and relevant hereto, Dr. Schwartz was engaged in the practice of medicine and was obliged to bring to bear in the practice of his profession the professional skill, knowledge, and care which he possessed, and to pursue his profession in accordance with reasonably safe standards of medicine.

36. At all times mentioned herein and relevant hereto. Dr. Schwartz was acting as an agent and/or employee of defendants, Hartford Hospital and/or Hartford Healthcare Corporation and/or Hartford Healthcare Medical Group, Inc., and as such defendants, Hartford Hospital and/or Hartford Healthcare Corporation and/or Hartford Healthcare Medical Group, Inc., are liable for Dr. Schwartz actions under theories of agency, ostensible agency, apparent agency, respondeat superior, and/or vicarious liability.

37. At all times mentioned herein, Defendants, Backus Hospital, Backus Corporation, Hartford Hospital, Hartford Healthcare Corporation, Hartford Healthcare Medical Group, Inc., United Community and Family Services, Inc., Geetha R. Swamy Iyah, MD, Alfred Caudullo, DO, Indramattie Joseph, PA, and Paul J. Schwartz, MD, respectively, individually, jointly and severally, were charged with the professional responsibility of rendering proper medical care and treatment to Annette Blazin-Beavin, of properly and carefully examining Annette Blazin-Beavin in order to determine the proper diagnosis of her condition and of ensuring that proper medical care, attention and treatment would be provided to Annette Blazin-Beavin during all times which she remained under Defendants' care and treatment.

**FACTS**

38. Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

39. The records indicate that on May 19, 2016, Plaintiffs' Decedent, Annette Blazin-Beavin (hereinafter referred to as "Ms. Blazin-Beavin") presented to defendant, UCFS.

40. At the time of her presentation, she was evaluated by defendant, Dr. Iyah, who documented a "43 year old Caucasian/white female presents to this office to establish care." Further, Dr. Iyah noted a past medical history significant for syncope, high cholesterol, uncontrolled hypertension, migraines, and hysterectomy in 2009.

41. Further, Ms. Blazin-Beavin was being treated for hypertension with Lisinopril 10mg, once daily. At the time of evaluation, Decedent's blood pressure was 157/92; no adjustments to her anti-hypertensive medications were made nor were any anti-hypertensive medications added to her daily medication regimen.

42. On January 18, 2017, Ms. Blazin-Beavin again presented to defendant UCFS. At the time of presentation, her blood pressure was noted to be 180/96; no changes were made to her medication or treatment regimen. Additionally, Dr. Iyah requested Ms. Blazin-Beavin monitor her blood pressure at home and keep a blood pressure log.

43. On January 24, 2017, Ms. Blazin-Beavin again presented to defendant UCFS. At the time of her evaluation, her blood pressure was noted to be 155/78; no changes were made to her medication or treatment regimen.

44. On February 27, 2017, Ms. Blazin-Beavin again presented to defendant UCFS and was evaluated by defendant, Dr. Iyah. At the time of her evaluation, Ms. Blazin-Beavin was complaining of headache; her blood pressures were noted to be 181/107. Repeat blood pressures were noted to be 190/120, and 174/120. At that time, Dr. Iyah prescribed amlodipine 5mg, once daily.

45. On March 6, 2017, Ms. Blazin-Beavin again presented to defendant UCFS and was evaluated by defendant, Dr. Iyah. At the time of her evaluation, Ms. Blazin-Beavin's blood pressure

was recorded as 136/83; a repeat blood pressure was recorded as 140/100. Additionally, Dr. Iyah documented that Ms. Blazin-Beavin's blood pressures, as follows: "better bp 169/88, 161/75, 147/76 per log." At that time, Dr. Iyah increased Ms. Blazin-Beavin's Lisinopril dosage to 20mg, once daily. No additional work-up for other, secondary, causes of hypertension are noted to this point.

46. On July 5, 2017, Ms. Blazin-Beavin presented to William Backus Hospital Emergency Department with complaints of "heart racing, starting at 11PM, headache…nausea, tingling in left arm, and hypertension; her blood pressures were noted to be 224/118, 205/123, 197/121, 189/117, 191/121, and 189/107.

47. During the emergency department visit, she was administered anti-hypertensive medication and discharged the same day with instruction to follow up with Dr. Iyah, which she did; at the time of discharge, her blood pressure was noted to be 180/101.

48. According to the records, as of July 10, 2017, defendant Dr. Iyah was aware of Ms. Blazin-Beavin's emergency department visit and that her BP was "out of control" with complaints of headache and nausea; despite this, no additional visits are noted. Defendant Dr. Iyah referred Ms. Blazin-Beavin to Mark N. Fiengo, DO, a cardiologist, for further work-up.

49. On July 27, 2017, Ms. Blazin-Beavin was evaluated by Dr. Fiengo; in part, Dr. Fiengo documented, as follows: "malignant hypertension…[this] is a relatively young woman…[reports] hypertension started approximately 2009 prior to that [has] been normotensive…[no] secondary workup ever performed."

50. According to the records, on September 24, 2017, at or around 22:30, Ms. Blazin-Beavin left her home for work; within minutes Ms. Blazin-Beavin was found in her car by family and appearing to be confused and not able to communicate clearly and so 911 was called.

51. Ms. Blazin-Beavin arrived to Backus Hospital emergency department at about 23:12 via ambulance; at or about that time, she came under the care of Defendant, Alfred Caudullo, DO.

52. At or about 23:15, Ms. Blazin-Beavin's neurological assessment revealed a Glasgow coma scale of 9.

53. At or about 23:15, Ms. Blazin-Beavin's blood pressure and heart rate were noted to be 187/89 and 101, respectively; no anti-hypertensive medications were initiated.

54. At or about 23:21, a CT scan of the brain demonstrated a basal ganglia hematoma with surrounding edema and mass effect with midline shift of the brain.

55. At or about 23:25, Ms. Blazin-Beavin's blood pressure was noted to be 242/107; no anti-hypertensive medications were administered.

56. At or about 23:29, Ms. Blazin-Beavin was intubated by Defendant, Dr. Caudullo.

57. At or about 23:35, Ms. Blazin-Beavin's blood pressure was noted to be 216/104; no anti-hypertensive medications were administered.

58. At or about 23:38, Ms. Blazin-Beavin's blood pressure was noted to be 208/101; no anti-hypertensive medications were administered.

59. At or about 23:40, Ms. Blazin-Beavin's blood pressure was noted to be 220/103; no anti-hypertensive medications were administered.

60. At or about 23:44, Nurse Tanya Pare administered Labetalol 20mg IV per Defendant Dr. Caudullo's order.

61. At or about 23:45, Ms. Blazin-Beavin's blood pressure remained elevated at 188/91; no additional anti-hypertensive medications were administered.

62. At or about 23:50, Ms. Blazin-Beavin's blood pressure remained elevated at 188/92; no additional anti-hypertensive medications were administered.

63. At or about 23:58, a nicardipine drip was initiated by LIFE STAR, a critical care helicopter transport service; shortly thereafter, Ms. Blazin-Beavin was transported to Defendant, Hartford Hospital.

64. On September 25, 2017, at or about 00:50, Ms. Blazin-Beavin arrived at Hartford Hospital emergency department; the records indicate that, in-flight, her condition worsened and she received mannitol, a medication used to reduce brain swelling.

65. At or about 01:30, Ms. Blazin-Beavin underwent neurosurgical consultation and was evaluated by Defendant, PA Joseph.

66. At or about 01:30, Defendant, PA Joseph, noted the following: "45F, GCS 4 … Stat OR for hemicraniectomy, EVD [external ventricular drain] placement…consent obtained…OR booked."

67. At or about 01:30, Defendant, PA Joseph, documented his plan, as follows: "BP parameters… SBP<140>100…disposition[:] stat     [craniectomy]…imaging[:] will defer for further imaging workup per neurology…the case was discussed with [Defendant] Dr. Paul Schwartz…we reviewed the history, clinical findings, laboratory data, and films together and are in agreement with the assessment and plan."

68. The records indicate that, at or about 02:30, Ms. Blazin-Beavin was evaluated by Subhendu Rath, MD who documented that she likely suffered re-bleeding after the initial hemorrhage.

69. According to the records, at or about 05:06, Ms. Blazin-Beavin went to the OR for a hemicraniectomy; prior to this point, no external ventricular drain, or other appropriate interventions, had been placed or taken.

70. At or about 05:30, Defendant, Dr. Schwartz, performed a hemicraniectomy with clot evacuation and external ventricular drain placement.

71. Post-operatively, at or about 15:40, a CTA of the head was performed which demonstrated, among other things, decreased mass effect as compared to the preoperative study.

72. On November 17, 2017, Ms. Blazin-Beavin was transferred from Defendant, Hartford Hospital, to Middlesex Health Care Center for continued medical care; at the time of her transfer, the records indicate she had suffered from, among other things, hypertensive urgency, intracranial hemorrhage, acute on chronic hypoxic respiratory failure, craniotomy, dysphagia, heparin-induced thrombocytopenia, deep vein thrombosis, pulmonary emboli, sepsis, and pressure sores.

73. On April 11, 2018, Ms. Blazin-Beavin was transported from Middlesex Health Care Center to Middlesex Hospital where she was treated for malignant hypertension, tachycardia, and urinary tract infection; she was then discharged back to Middlesex Health Care Center.

74. On July 4, 2018, Ms. Blazin-Beavin suffered seizures and was transported from Middlesex Health Care Center to Middlesex Hospital for further treatment; a brain CT scan was performed and demonstrated progressive chronic changes without evidence of acute intracranial mass or hemorrhage.

75. On August 28, 2018, Ms. Blazin-Beavin suffered additional seizure activity and was transported from Middlesex Health Care Center to Middlesex Hospital for further treatment; a brain CT scan demonstrated, among other findings, an acute large right cerebral hemorrhage with mass effect.

76. Moreover, a chest x-ray demonstrated Ms. Blazin-Beavin had suffered a right shoulder dislocation.

77. Ms. Blazin-Beavin was then transported from Middlesex Hospital to Yale – New Haven Hospital for further treatment; during transport, her condition deteriorated.

78. Upon arrival to Yale – New Haven Hospital, a brain CT scan demonstrated an enlarging intracerebral hemorrhage with progressive midline shift and brain herniation.

79. On August 29, 2018, at 10:14, Ms. Blazin-Beavin succumbed to her medical conditions, as described herein, and was pronounced deceased.

80. Attached hereto, as Exhibit C, are opinion letters from similar healthcare providers, provided pursuant to § 52-190a(a) of the General Statutes.

**COUNT ONE:    (PLAINTIFFS v. DEFENDANT, BACKUS HOSPITAL)**

81. Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

82. The Defendant, Backus Hospital, was negligent and breached the applicable standards of care, in one or more of the following ways, in:

a)    Failing to have proper policies and/or procedures in place for the management of a patient, such as Annette Blazin-Beavin, suffering from hypertension and/or stroke;

b)    failing to take a proper history from Annette Blazin-Beavin;

c)    failing to make a proper and timely diagnosis of Annette Blazin-Beavin's hypertensive condition;

d)    failing to formulate an appropriate and effective treatment plan for the treatment of Annette Blazin-Beavin's medical conditions;

e)    failing to order and/or provide adequate pharmacological treatment of Annette Blazin-Beavin's hypertensive condition;

f)    failing to make proper and timely referrals to specialists for the further evaluation and/or treatment of Annette Blazin-Beavin's hypertension;

g)    failing to appropriately manage Annette Blazin-Beavin's medical care prior to and/or at the time of her September 24, 2017 stroke;

h)    delaying medical intervention for Annette Blazin-Beavin;

i)    failing to appreciate signs and symptoms of an impending cerebrovascular accident;

j)    failing to make proper and/or timely assessments upon Annette Blazin-Beavin;

k)    failing to order proper medical testing in order to assess and/or treat Annette Blazin-Beavin's hypertensive condition;

l)    failing to order a CT angiogram to rule out potential renal artery stenosis;

14

m)    failing to order cortisol levels in a timely manner;

n)    failing to order, perform, and/or refer Annette Blazin-Beavin for renin aldosterone testing;

o)    failing to order, perform, and/or refer Annette Blazin-Beavin for pheochromocytoma work-up;

p)    failing to perform a secondary work-up in order to properly manage and treat Annette Blazin-Beavin's hypertensive condition;

q)    failing to provide timely and appropriate emergency medical treatment to Annette Blazin-Beavin during her emergency department visit on September 24, 2017;

r)    failing to provide timely and appropriate pharmacological management of Annette Blazin-Beavin's blood pressure under the circumstances;

s)    failing to provide timely and appropriate management of Annette Blazin-Beavin's medical condition;

t)    failing to provide appropriate management and treatment of Annette Blazin-Beavin's hypertensive crisis;

u)    failing to provide appropriate management and treatment of Annette Blazin-Beavin's acute neurological compromise;

v)    failing to order proper medications to manage and treat Annette Blazin-Beavin's medical condition;

w)    increasing the risk that Annette Blazin-Beavin's clinical condition would deteriorate prior to her arrival at Hartford Hospital emergency department;

x)    increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to the delay of surgical intervention to treat her ongoing cerebrovascular event and acute neurological compromise;

y)    failing to administer proper treatment including, but not limited to, the placement of an external ventricular drain;

z)    failing to retain competent healthcare practitioners in order to ensure that Decedent received appropriate care and treatment;

aa)    improperly credentialing healthcare practitioners which resulted in the Decedent suffering from the injuries and death, described herein;

bb)    increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions; and,

cc)    providing medical care and treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

83. As a direct and proximate result of the aforementioned professional negligence, there was

a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition,

which allowed for her hypertension to remain unchecked and untreated prior to her September 24, 2017 stroke. The aforementioned failures to properly work-up, diagnose, and treat were the direct and proximate result of Annette Blazin-Beavin's stroke and/or subsequent death.

84. As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her stroke on September 24, 2017 and subsequent death on August 29, 2018.

85. As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment while a patient at Backus Hospital, beginning on September 24, 2017, which resulted in the worsening of her medical condition and/or clinical deterioration.

86. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

87. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering.

88. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from, among other things, being cognitively intact but physically paralyzed and unable to move or speak at the time of and/or following her initial stroke on September 24, 2017.

89. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including, but not limited to, her stroke and the subsequent deterioration of her medical condition.

90. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

91. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

92. As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT TWO:**        **(PLAINTIFFS vs. DEFENDANT, BACKUS CORPORATION)**

93. Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

94. The Defendant, Backus Corporation, was negligent and breached the applicable standards of care, in one or more of the following ways, in:

   a. Failing to have proper policies and/or procedures in place for the management of a patient, such as Annette Blazin-Beavin, suffering from hypertension and/or stroke;

   b. failing to take a proper history from Annette Blazin-Beavin;

   c. failing to make a proper and timely diagnosis of Annette Blazin-Beavin's hypertensive condition;

   d. failing to formulate an appropriate and effective treatment plan for the treatment of Annette Blazin-Beavin's medical conditions;

   e. failing to order and/or provide adequate pharmacological treatment of Annette Blazin-Beavin's hypertensive condition;

   f. failing to make proper and timely referrals to specialists for the further evaluation and/or treatment of Annette Blazin-Beavin's hypertension;

   g. failing to appropriately manage Annette Blazin-Beavin's medical care prior to and/or at the time of her September 24, 2017 stroke;

   h. delaying medical intervention for Annette Blazin-Beavin;

   i. failing to appreciate signs and symptoms of an impending cerebrovascular accident;

   j. failing to make proper and/or timely assessments upon Annette Blazin-Beavin;

k.  failing to order proper medical testing in order to assess and/treat Annette Blazin-Beavin's hypertensive condition;

l.  failing to order a CT angiogram to rule out potential renal artery stenosis;

m.  failing to order cortisol levels in a timely manner;

n.  failing to order, perform, and/or refer Annette Blazin-Beavin for renin aldosterone testing;

o.  failing to order, perform, and/or refer Annette Blazin-Beavin for pheochromocytoma work-up;

p.  failing to perform a secondary work-up in order to properly manage and treat Annette Blazin-Beavin's hypertensive condition;

q.  failing to provide timely and appropriate emergency medical treatment to Annette Blazin-Beavin during her emergency department visit on September 24, 2017;

r.  failing to provide timely and appropriate pharmacological management of Annette Blazin-Beavin's blood pressure under the circumstances;

s.  failing to provide timely and appropriate management of Annette Blazin-Beavin's medical condition;

t.  failing to provide appropriate management and treatment of Annette Blazin-Beavin's hypertensive crisis;

u.  failing to provide appropriate management and treatment of Annette Blazin-Beavin's acute neurological compromise;

v.  failing to order proper medications to manage and treat Annette Blazin-Beavin's medical condition;

w.  increasing the risk that Annette Blazin-Beavin's clinical condition would deteriorate prior to her arrival at Hartford Hospital emergency department;

x.  increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to the delay of surgical intervention to treat her ongoing cerebrovascular event and acute neurological compromise;

y.  failing to administer proper treatment including, but not limited to, the placement of an external ventricular drain;

z.  failing to retain competent healthcare practitioners in order to ensure that Decedent received appropriate care and treatment;

aa.  improperly credentialing healthcare practitioners which resulted in the Decedent suffering from the injuries and death, described herein;

bb.  increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions; and,

cc.  providing medical care and treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

95. As a direct and proximate result of the aforementioned professional negligence, there was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition, which allowed for her hypertension to remain unchecked and untreated prior to her September 24, 2017 stroke. The aforementioned failures to properly work-up, diagnose, and treat were the direct and proximate result of Annette Blazin-Beavin's stroke and/or subsequent death.

96. As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her stroke on September 24, 2017 and subsequent death on August 29, 2018.

97. As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment while a patient at Backus Hospital, beginning on September 24, 2017, which resulted in the worsening of her medical condition.

98. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

99. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering,

100. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from, among other things, being cognitively intact but physically paralyzed and unable to move or speak.

101. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her

hypertension, including, but not limited to, her stroke and the subsequent deterioration of her medical condition.

102.     As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

103.     As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

104.     As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT THREE:     (PLAINTIFFS vs. DEFENDANT, HARTFORD HOSPITAL)**

105.     Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

106.     The Defendant, Hartford Hospital, was negligent and breached the applicable standards of care, in one or more of the following ways, in:

    a.  Failing to have proper policies and/or procedures in place for the management of a patient, such as Annette Blazin-Beavin, suffering from hypertension and/or stroke;

    b.  failing to appropriately manage Annette Blazin-Beavin's medical and/or surgical care on September 25, 2017;

    c.  failing to appreciate signs and symptoms of a worsening stroke on September 25, 2017;

    d.  contributing to the worsening of the underlying stroke by the delaying of medical and/or surgical treatment of same;

    e.  contributing to impending and/or ongoing stroke by failing to administer proper medications;

    f.  failing to place proper orders such that Annette Blazin-Beavin would receive appropriate and/or timely medical and/or surgical intervention;

    g.  failing to provide appropriate management and treatment of Annette Blazin-Beavin's stroke;

h.  failing to order proper medications to manage and treat Annette Blazin-Beavin's condition;

i.  delaying medical treatment for Annette Blazin-Beavin;

j.  delaying surgical intervention for Annette Blazin-Beavin;

k.  failing to place an external ventricular drain in a timely manner;

l.  failing to perform neurosurgery upon Annette Blazin-Beavin in a timely manner;

m.  failing to disseminate necessary and important treatment information amongst Annette Blazin-Beavin's healthcare providers including, but not limited to the neurosurgery and/or neurology team members;

n.  failing to timely notify the appropriate medical and surgical care team members such that medical and/or surgical intervention would occur upon Annette Blazin-Beavin in a timely manner;

o.  increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to her improperly managed blood pressure, cerebrovascular event, and neurological compromise;

p.  failing to retain competent healthcare practitioners in order to ensure that Decedent received appropriate care and treatment;

q.  improperly credentialing healthcare practitioners which resulted in the Decedent suffering from the injuries and death, described herein;

r.  increasing the risk that Annette Blazin-Beavin would suffer severe injury from a cerebrovascular event; and,

s.  providing medical and/or surgical care and/or treatment which was below the standard of care, thereby increasing the risk of harm to Annette Blazin-Beavin's well-being.

107.    As a direct and proximate result of the aforementioned professional negligence, there was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition, which allowed for her hypertension to remain unchecked and untreated prior to her September 24, 2017 stroke. The aforementioned failures to properly work-up, diagnose, and treat were the direct and proximate result of Annette Blazin-Beavin's stroke and/or subsequent death.

108.    As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her stroke on September 24, 2017 and subsequent death on August 29, 2018.

109.    As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment while a patient at Backus Hospital, beginning on September 24, 2017, which resulted in the worsening of her medical condition.

110.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

111.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering,

112.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from being cognitively intact but physically paralyzed and unable to move or speak.

113.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including, but not limited to, her stroke and the subsequent deterioration of her medical condition.

114.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

115.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

116.    As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT FOUR:**      **(PLAINTIFFS vs. DEFENDANT, HARTFORD HEALTHCARE CORPORATION)**

117.     Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

118.     The Defendant, Hartford Healthcare Corporation, was negligent and breached the applicable standards of care, in one or more of the following ways, in:

   a.  Failing to have proper policies and/or procedures in place for the management of a patient, such as Annette Blazin-Beavin, suffering from hypertension and/or stroke;

   b.  failing to take a proper history from Annette Blazin-Beavin;

   c.  failing to properly and/or timely evaluate Annette Blazin-Beavin;

   d.  failing to appropriately manage Annette Blazin-Beavin's medical conditions including, but not limited to, her hypertension and/or stroke;

   e.  failing to appropriately manage Annette Blazin-Beavin's medical and/or surgical care prior to and/or at the time of and/or continuing through her stroke;

   f.  failing to make a proper and/or timely diagnosis of Annette Blazin-Beavin's medical conditions including, but not limited to, her hypertension and/or stroke;

   g.  failing to formulate an appropriate and effective treatment plan for the treatment of Annette Blazin-Beavin's medical conditions including, but not limited to, her hypertension and/or stroke;

   h.  failing to provide adequate pharmacological management and/or treatment of Annette Blazin-Beavin's medical condition including, but not limited to, her hypertension and/or stroke;

   i.  failing to appreciate signs and symptoms of an impending cerebrovascular accident;

   j.  failing to make proper and timely referrals to specialists for the further evaluation and/or treatment of Annette Blazin-Beavin's hypertension;

   k.  failing to order a CT angiogram to rule out potential renal artery stenosis;

   l.  failing to order cortisol levels in a timely manner;

   m.  failing to order, perform, and/or refer Anette Blazin-Beavin for renin aldosterone testing;

   n.  failing to order, perform, and/or refer Annette Blazin-Beavin for pheochromocytoma work-up;

   o.  failing to perform a secondary work-up in order to properly manage and/or treat Annette Blazin-Beavin's hypertension prior to her September 24, 2017 stroke;

p.   failing to provide timely and proper emergency medical and/or surgical treatment to Annette Blazin-Beavin during her emergency department visit on September 24, 2017;

q.   increasing the risk that Annette Blazin-Beavin's clinical condition would deteriorate prior to her arrival at Hartford Hospital's emergency department;

r.   increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to the delay of surgical intervention to treat her ongoing cerebrovascular event;

s.   delaying surgical intervention for Annette Blazin-Beavin;

t.   failing to place an external ventricular drain in a timely manner;

u.   failing to perform neurosurgery upon Annette Blazin-Beavin in a timely manner;

v.   failing to timely notify the appropriate medical and surgical care team members such that medical and/or surgical intervention would occur upon Annette Blazin-Beavin in a timely manner;

w.   failing to appreciate signs and symptoms of a worsening cerebrovascular accident;

x.   failing to place proper orders such that Annette Blazin-Beavin would receive appropriate and/or timely medical and/or surgical intervention;

y.   failing to properly communicate findings and/or important treatment information with and/or amongst the neurosurgery and/or neurology physicians;

z.   failing to retain competent healthcare practitioners in order to ensure that Decedent received appropriate care and treatment;

aa.   improperly credentialing healthcare practitioners which resulted in the Decedent suffering from the injuries and death, described herein;

bb.   increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to, her hypertension and/or stroke; and,

cc.   providing medical care and treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

119.     As a direct and proximate result of the aforementioned professional negligence, there was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition, which allowed for her hypertension to remain unchecked and untreated prior to her September 24, 2017 stroke. The aforementioned failures to properly work-up, diagnose, and treat were the direct and proximate result of Annette Blazin-Beavin's stroke and/or subsequent death.

120.     As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her stroke on September 24, 2017 and subsequent death on August 29, 2018.

121.     As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment while a patient at Backus Hospital, beginning on September 24, 2017, which resulted in the worsening of her medical condition.

122.     As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

123.     As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering.

124.     As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from being cognitively intact but physically paralyzed and unable to move or speak.

125.     As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including her stroke and the subsequent deterioration of her medical condition.

126.     As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

127.     As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

128.     As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT FIVE:**        **(PLAINTIFFS vs. DEFENDANT, HARTFORD HEALTHCARE MEDICAL GROUP, INC.)**

129.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

130.    The Defendant, Hartford Healthcare Medical Group, Inc., was negligent and breached the applicable standards of care, in one or more of the following ways, in:

a)    Failing to have proper policies and/or procedures in place for the management of a patient, such as Annette Blazin-Beavin, suffering from hypertension and/or stroke;

b)    delaying medical treatment for Annette Blazin-Beavin;

c)    delaying surgical intervention for Annette Blazin-Beavin;

d)    failing to place an external ventricular drain in a timely manner;

e)    failing to perform neurosurgery upon Annette Blazin-Beavin in a timely manner;

f)    failing to timely notify the appropriate medical and surgical care team members such that medical and/or surgical intervention would occur upon Annette Blazin-Beavin in a timely manner;

g)    failing to disseminate necessary and/or important treatment information amongst Annette Blazin-Beavin's healthcare providers including, but not limited to her neurosurgery and/or neurology physicians;

h)    failing to appreciate signs and symptoms of a worsening cerebrovascular accident;

i)    contributing to the worsening of the underlying cerebrovascular event by the delaying of medical and/or surgical treatment of same;

j)    failing to place proper orders such that Annette Blazin-Beavin would receive appropriate and/or timely medical and/or surgical intervention;

k)    failing to provide appropriate management and treatment of Annette Blazin-Beavin's stroke;

l)    failing to appropriately manage Annette Blazin-Beavin's medical and/or surgical care;

m)    failing to order proper medications to manage and treat Annette Blazin-Beavin's medication condition;

n)    increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to her improperly managed blood pressure and/or cerebrovascular event

o) contributing to impending and/or ongoing cerebrovascular event by failing to administer proper medications;

p) failing to retain competent healthcare practitioners in order to ensure that Decedent received appropriate care and treatment;

q) improperly credentialing healthcare practitioners which resulted in the Decedent suffering from the injuries and death, described herein;

r) increasing the risk that Annette Blazin-Beavin would suffer severe injury from a cerebrovascular event; and,

s) providing medical and/or surgical care and/or treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

131.    As a direct and proximate result of the aforementioned professional negligence, there was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition, which allowed for her condition to worsen on September 25, 2017 prior to her undergoing appropriate surgical intervention. The aforementioned failures to properly work-up, diagnose, and/or treat were the direct and proximate result of Annette Blazin-Beavin's clinical deterioration and subsequent death.

132.    As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her further deterioration on September 25, 2017 and subsequent death on August 29, 2018.

133.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

134.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering,

135.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from being cognitively intact but physically paralyzed and unable to move or speak.

136.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including, but not limited to, her stroke.

137.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

138.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

139.    As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT SIX:**        **(PLAINTIFFS vs. DEFENDANT, UNITED COMMUNITY AND FAMILY SERVICES, INC.)**

140.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

141.    The Defendant, United Community and Family Services, Inc., was negligent and breached the applicable standards of care, in one or more of the following ways, in:

   a.    Failing to have proper policies and/or procedures in place for the management of a patient, such as Annette Blazin-Beavin, suffering from hypertension and/or stroke;

   b.    failing to take a proper history from Annette Blazin-Beavin;

   c.    failing to make a proper and timely diagnosis of Annette Blazin-Beavin's hypertensive condition;

d.  failing to formulate an appropriate and effective treatment plan for the treatment of Annette Blazin-Beavin's medical conditions;

e.  failing to provide adequate pharmacological treatment of Annette Blazin-Beavin's hypertensive condition;

f.  failing to make proper and timely referrals to specialists for the further evaluation and/or treatment of Annette Blazin-Beavin's hypertension;

g.  failing to appropriately manage Annette Blazin-Beavin's medical care;

h.  delaying medical intervention for Annette Blazin-Beavin;

i.  failing to appreciate signs and symptoms of an impending cerebrovascular accident;

j.  failing to timely assess Annette Blazin-Beavin;

k.  failing to order proper medical testing;

l.  failing to order a CT angiogram to rule out potential renal artery stenosis;

m.  failing to order cortisol levels in a timely manner;

n.  failing to order, perform, and/or refer Anette Blazin-Beavin for renin aldosterone testing;

o.  failing to order, perform, and/or refer Annette Blazin-Beavin for pheochromocytoma work-up;

p.  failing to perform a secondary work-up in order to properly manage and treat Annette Blazin-Beavin's hypertensive condition;

q.  failing to retain competent healthcare practitioners in order to ensure that Decedent received appropriate care and treatment;

r.  improperly credentialing healthcare practitioners which resulted in the Decedent suffering from the injuries and death, described herein;

s.  increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from hypertension and/or stroke; and,

t.  providing medical care and treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

142.    As a direct and proximate result of the aforementioned professional negligence, there was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition, which allowed for her hypertension to remain unchecked and untreated prior to her September 24, 2017 stroke. The aforementioned failures to properly work-up, diagnose, and treat were the direct and proximate result of Annette Blazin-Beavin's stroke and subsequent death.

143.    As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her stroke on September 24, 2017 and subsequent death on August 29, 2018.

144.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

145.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering,

146.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from being cognitively intact but physically paralyzed and unable to move or speak.

147.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including, but not limited to, her stroke.

148.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

149.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

150.    As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT SEVEN:    (AS TO DEFENDANT, GEETHA R. SWAMY IYAH, MD)**

151.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

152.    The Defendant, Geetha R. Swamy Iyah, MD, was negligent and breached the

applicable standards of care, in one or more of the following ways, in:

    a.  failing to take a proper history from Annette Blazin-Beavin;

    b.  failing to make a proper and timely diagnosis of Annette Blazin-Beavin's hypertensive condition;

    c.  failing to formulate an appropriate and effective treatment plan for the treatment of Annette Blazin-Beavin's medical conditions;

    d.  failing to provide adequate pharmacological treatment of Annette Blazin-Beavin's hypertensive condition;

    e.  failing to make proper and timely referrals to specialists for the further evaluation and/or treatment of Annette Blazin-Beavin's hypertension;

    f.  failing to appropriately manage Annette Blazin-Beavin's medical care;

    g.  delaying medical intervention for Annette Blazin-Beavin;

    h.  failing to appreciate signs and symptoms of an impending cerebrovascular accident;

    i.  failing to timely assess Annette Blazin-Beavin;

    j.  failing to order proper medical testing;

    k.  failing to order a CT angiogram to rule out potential renal artery stenosis;

    l.  failing to order cortisol levels in a timely manner;

    m.  failing to order, perform, and/or refer Anette Blazin-Beavin for renin aldosterone testing;

    n.  failing to order, perform, and/or refer Annette Blazin-Beavin for pheochromocytoma work-up;

    o.  failing to perform a secondary work-up in order to properly manage and treat Annette Blazin-Beavin's hypertensive condition;

    p.  increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from a stroke; and,

    q.  providing medical care and treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

153.    As a direct and proximate result of the aforementioned professional negligence, there

was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition,

which allowed for her hypertension to remain unchecked and untreated prior to her

September 24, 2017 stroke. The aforementioned failures to properly work-up, diagnose, and

treat were the direct and proximate result of Annette Blazin-Beavin's stroke and subsequent death.

154.    As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her stroke on September 24, 2017 and subsequent death on August 29, 2018.

155.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

156.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering,

157.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from being cognitively intact but physically paralyzed and unable to move or speak.

158.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including, but not limited to, her stroke.

159.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

160.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

161.    As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT EIGHT:**    (PLAINTIFFS vs. DEFENDANT, ALFRED CAUDULLO, DO)

162.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint

the same as if fully set forth hereinafter.

163.    The Defendant, Alfred Caudullo, DO, was negligent and breached the applicable

standards of care, in one or more of the following ways, in:

   a. failing to provide timely and proper emergency medical treatment to Annette Blazin-Beavin during her emergency department visit on September 24, 2017;

   b. failing to provide timely and appropriate pharmacological management of Annette Blazin-Beavin's blood pressure;

   c. failing to provide timely and appropriate management of Annette Blazin-Beavin's medical conditions including, but not limited to, her hypertension and/or stroke;

   d. delaying medical intervention for Annette Blazin-Beavin;

   e. failing to order proper medications to manage and/or treat Annette Blazin-Beavin's medical condition including, but not limited to, her hypertension and/or stroke;

   f. increasing the risk that Annette Blazin-Beavin's clinical condition would deteriorate prior to her arrival to Hartford Hospital's emergency department;

   g. increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to the delay of surgical intervention to treat her ongoing cerebrovascular event and acute neurological compromise;

   h. contributing to an ongoing cerebrovascular event by failing to administer proper medications and/or other treatment including, but not limited to, the placement of an external ventricular drain;

   i. increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her hypertension and/or stroke; and,

   j. providing medical care and treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

164.    As a direct and proximate result of the aforementioned professional negligence,

there was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's

condition, which allowed for her hypertension to remain unchecked and untreated prior to

her September 24, 2017 stroke. The aforementioned failures to properly work-up,

diagnose, and treat were the direct and proximate result of Annette Blazin-Beavin's stroke and subsequent death.

165.    As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her stroke on September 24, 2017 and subsequent death on August 29, 2018.

166.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

167.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering,

168.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from being cognitively intact but physically paralyzed and unable to move or speak.

169.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including, but not limited to, her stroke.

170.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

171.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

172.    As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT NINE:**        (PLAINTIFFS vs. DEFENDANT, INDRAMATTIE JOSEPH, PA)

173.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint

the same as if fully set forth hereinafter.

174.    The Defendant, Indramattie Joseph, PA, was negligent and breached the

applicable standards of care, in one or more of the following ways, in:

    a)    failing to appropriately manage Annette Blazin-Beavin's medical and/or surgical care on September 25, 2017;

    b)    failing to appreciate signs and symptoms of a worsening stroke on September 25, 2017;

    c)    contributing to the worsening of the underlying stroke by the delaying of medical and/or surgical treatment of same;

    d)    contributing to impending and/or ongoing stroke by failing to administer proper medications;

    e)    failing to place proper orders such that Annette Blazin-Beavin would receive appropriate and/or timely medical and/or surgical intervention;

    f)    failing to provide appropriate management and treatment of Annette Blazin-Beavin's stroke;

    g)    failing to order proper medications to manage and treat Annette Blazin-Beavin's condition;

    h)    delaying medical treatment for Annette Blazin-Beavin;

    i)    delaying surgical intervention for Annette Blazin-Beavin;

    j)    failing to place an external ventricular drain in a timely manner;

    k)    failing to perform neurosurgery upon Annette Blazin-Beavin in a timely manner;

    l)    failing to disseminate necessary and important treatment information amongst Annette Blazin-Beavin's healthcare providers including, but not limited to the neurosurgery and/or neurology team members;

    m)    failing to timely notify the appropriate medical and surgical care team members such that medical and/or surgical intervention would occur upon Annette Blazin-Beavin in a timely manner;

    n)    increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to her improperly managed blood pressure, cerebrovascular event, and neurological compromise;

    o)    increasing the risk that Annette Blazin-Beavin would suffer severe injury from a cerebrovascular event; and,

   p)  providing medical and/or surgical care and/or treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

175. As a direct and proximate result of the aforementioned professional negligence, there was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition, which allowed for her condition to worsen on September 25, 2017 prior to her undergoing appropriate surgical intervention. The aforementioned failures to properly work-up, diagnose, and treat were the direct and proximate result of Annette Blazin-Beavin's clinical deterioration and subsequent death.

176. As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her further deterioration on September 25, 2017 and subsequent death on August 29, 2018.

177. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

178. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering,

179. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from being cognitively intact but physically paralyzed and unable to move or speak.

180. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including, but not limited to, her stroke.

181.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

182.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

183.    As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.

**COUNT TEN:**       **(PLAINTIFFS vs. DEFENDANT, PAUL J. SCHWARTZ, MD)**

184.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

185.    The Defendant, Paul J. Schwartz, MD, was negligent and breached the applicable standards of care, in one or more of the following ways, in:

   a. failing to appropriately manage Annette Blazin-Beavin's medical and/or surgical care on September 25, 2017;
   b. failing to appreciate signs and symptoms of a worsening stroke on September 25, 2017;
   c. contributing to the worsening of the underlying stroke by the delaying of medical and/or surgical treatment of same;
   d. contributing to impending and/or ongoing stroke by failing to administer proper medications;
   e. failing to place proper orders such that Annette Blazin-Beavin would receive appropriate and/or timely medical and/or surgical intervention;
   f. failing to provide appropriate management and treatment of Annette Blazin-Beavin's stroke;
   g. failing to order proper medications to manage and treat Annette Blazin-Beavin's condition;
   h. delaying medical treatment for Annette Blazin-Beavin;
   i. delaying surgical intervention for Annette Blazin-Beavin;
   j. failing to place an external ventricular drain in a timely manner;
   k. failing to perform neurosurgery upon Annette Blazin-Beavin in a timely manner;
   l. failing to disseminate necessary and important treatment information amongst Annette Blazin-Beavin's healthcare providers including, but not limited to the neurosurgery and/or neurology team members;

m. failing to timely notify the appropriate medical and surgical care team members such that medical and/or surgical intervention would occur upon Annette Blazin-Beavin in a timely manner;

n. increasing the risk that Annette Blazin-Beavin would suffer severe injury and/or death from her medical conditions including, but not limited to her improperly managed blood pressure, cerebrovascular event, and neurological compromise;

o. increasing the risk that Annette Blazin-Beavin would suffer severe injury from a cerebrovascular event; and,

p. providing medical and/or surgical care and/or treatment which was below the standard of care, increasing the risk of harm to Annette Blazin-Beavin's well-being.

186. As a direct and proximate result of the aforementioned professional negligence, there was a failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's condition, which allowed for her condition to worsen on September 25, 2017 prior to her undergoing appropriate surgical intervention. The aforementioned failures to properly work-up, diagnose, and treat were the direct and proximate result of Annette Blazin-Beavin's clinical deterioration and subsequent death.

187. As a direct and proximate result of the aforementioned professional negligence, Annette Blazin-Beavin did not receive proper evaluation and treatment which resulted in her further deterioration on September 25, 2017 and subsequent death on August 29, 2018.

188. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered an increased risk of morbidity and mortality.

189. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered conscious pain and suffering,

190. As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin experienced emotional and physical suffering from being cognitively intact but physically paralyzed and unable to move or speak.

191.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin suffered a diminished prognosis as a result of the sequelae of her hypertension, including, but not limited to, her stroke.

192.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her life and her ability to enjoy and engage in life's activities.

193.    As a direct and proximate result of the aforementioned negligence, Annette Blazin-Beavin lost her earning capacity.

194.    As a direct and proximate result of the aforementioned negligence, the Estate of Annette Blazin-Beavin incurred medical bills as well as funeral and burial expenses.


**COUNT ELEVEN: (PLAINTIFF, ERIC M. BEAVIN, IN HIS OWN RIGHT, v. ALL DEFENDANTS, FOR LOSS OF CHANCE)**

195.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

196.    Each Defendant described above engaged in professional negligence, as detailed above.

197.    Absent said professional negligence, Annette Blazin-Beavin had a greater than 50 percent chance of survival.

198.    The professional negligence of the Defendants, individually or in combination, more likely than not deprived Annette Blazin-Beavin of the chance of surivial.

## COUNT TWELVE: (PLAINTIFF, ERIC M. BEAVIN, IN HIS OWN RIGHT, v. ALL DEFENDANTS, FOR LOSS OF SPOUSAL CONSORTIUM)

199.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

200.    At all times relevant to this action, the Plaintiff, Eric M. Beavin, was married to Decedent, Annette Blazin-Beavin.

201.    Each Defendant described above engaged in professional negligence, as detailed above.

202.    As a direct and proximate result of the aforesaid negligence, Eric M. Beavin lost the love, society, and companionship and consortium of Annette Blazin-Beavin.

## COUNT THIRTEEN: (PLAINTIFF, WILLIAM BEAVIN, IN HIS OWN RIGHT, v. ALL DEFENDANTS, FOR LOSS OF PARENTAL/FILIAL CONSORTIUM)

203.    Plaintiffs hereby incorporate by reference all preceding Paragraphs of this complaint the same as if fully set forth hereinafter.

204.    At all times relevant to this action, the Plaintiff, William Beavin, was the child of Annette Blazin-Beavin.

205.    Each Defendant described above engaged in professional negligence, as detailed above.

206.    As a direct and proximate result of the aforesaid negligence, the Plaintiff, William Beavin, suffered, is suffering, and will, for an indefinite period of time in the future, suffer damages, injuries, and losses, including, but not limited to, the permanent deprivation of his mother's companionship, guidance, services, moral upbringing, tutelage, counsel, society, and love, as well as a loss of her financial support and contributions.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs pray for relief, as follows: trial by Jury; judgment against all Defendants, and each of them respectively, individually, jointly and severally, for separate sums in monetary damages in excess of the Jurisdictional requirement; and, such other and further relief as the Court may deem appropriate.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFFS**

_**By:         /s/Alexander T. Taubes**_
Alexander Tiva Taubes, Esq. ct30100
Alexander T. Taubes
470 James Street, Suite 007
New Haven, Connecticut, 06513
(203) 909-0048
alextt@gmail.com

**Please enter our appearances on behalf of the Plaintiffs.**