```
                              UNITED STATES DISTRICT COURT
                                 DISTRICT OF CONNECTICUT

------------------------------x
                              :
ERIC M. BEAVIN, Administrator :   Civ. No. 3:21CV00579(SALM)
of the Estate of Annette      :
Blazin-Beavin, et al.         :
                              :
                              :
                              :
v.                            :
                              :
WILLIAM M. BACKUS HOSPITAL,   :
et al.                        :   November 24, 2021
                              :
------------------------------x
```

**RULING ON MOTION TO DISMISS [Doc. #37]**

Defendant United States of America ("United States") has filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) seeking to dismiss the claims asserted against it in the Amended Complaint. [Doc. #37]. Plaintiffs have filed a memorandum in opposition to the motion to dismiss [Doc. #43], to which the United States has filed a reply [Doc. #45]. For the reasons stated below, the Motion to Dismiss [**Doc. #37**] is **DENIED**, without prejudice.

**I.   Procedural Background**

Plaintiff Eric M. Beavin ("Mr. Beavin") is the widower, and administrator of the Estate, of Annette Blazin-Beavin. ("Ms. Blazin-Beavin"). See Doc. #14 at 2, ¶8.[1] Mr. Beavin and his son

---

[1] Throughout this Ruling, the Court cites to the page number reflected in the cited document's ECF header.

1

William Beavin bring this action against the United States and other defendants asserting claims for wrongful death, medical malpractice, and loss of consortium. See generally Doc. #14.

The Court takes judicial notice of the procedural background in this action, which was originally filed on December 23, 2019, in Connecticut State Superior Court. See Beavin v. William W. Backus Hosp., No. 3:20CV00482(RNC), 2021 WL 1264424, at *1 (D. Conn. Apr. 6, 2021) (hereinafter "Beavin I").[2] The United States removed that action to the District of Connecticut on April 10, 2020, asserting that "certain treatment provided to Ms. Blazin-Beavin by two of the defendants – United Community and Family Services, Inc. ("UCFS") and Geetha R. Swamy Iyah, M.D. – fell within the purview of the Federal Tort Claims Act[.]" Id.[3]

---

[2] When acting on a Rule 12(b)(6) motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

[3] "[T]he United States asked to be substituted as the proper defendant in place of UCFS for acts and omissions by UCFS occurring between June 3, 2016 and August 29, 2018, and as the proper defendant for acts and omissions by Dr. Iyah occurring between June 3, 2016 and August 30, 2017." Beavin I, 2021 WL 1264424, at *1.

In Beavin I, the United States moved pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss plaintiffs' claims for failure to exhaust administrative remedies before filing in state court. See id. Judge Robert N. Chatigny granted that motion because plaintiffs "did not file an administrative claim until January 13, 2020, approximately three weeks after th[e] suit was filed in state court[,]" and six months had not passed without a final agency decision. Beavin I, 2021 WL 1264424, at *2; see also Doc. #12 (Standard Form 95).

Plaintiffs re-filed this action on April 28, 2021, asserting subject matter jurisdiction based on the Federal Tort Claims Act ("FTCA"). See Doc. #1 at 1, ¶1. Plaintiffs filed an Amended Complaint on May 14, 2021, which is the operative pleading in this matter. See Doc. #14.

## II.  Factual Allegations

For purposes of this motion, the Court presumes the following factual allegations from the Amended Complaint [Doc. #14] to be true.[4]

---

[4] The United States attaches medical records to the motion to dismiss and, pursuant to Rule 12(d), requests that if the Court's decision turns on these records to convert the motion to one for summary judgment. See Doc. #37 at 11 n.10. These records would not change the Court's decision at this stage. Accordingly, the Court will not convert the motion pursuant to Rule 12(d).

In 2016 and 2017, Ms. Blazin-Beavin was treated by defendant Dr. Geetha R. Swamy Iyah ("Dr. Iyah") at UCFS in Norwich, Connecticut.[5] See Doc. #14 at 9-10, ¶¶40-46. Ms. Blazin-Beavin first treated with Dr. Iyah at UCFS on May 19, 2016, when it was noted that she had "a past medical history significant for syncope, high cholesterol, uncontrolled hypertension, [and] migraines[.]" Doc. #14 at 9, ¶40; see also id. at ¶¶40-41. Her blood pressure was recorded as 157/92. See id. at ¶42. At that time, Ms. Blazin-Beavin "was being treated for hypertension with Lisinopril 10mg, once daily." Id. Dr. Iyah did not adjust Ms. Blazin-Beavin's blood pressure medication. See id.

Ms. Blazin-Beavin next presented to Dr. Iyah on January 18, 2017, at which time her blood pressure was recorded as 180/96. See id. at ¶43. Although Dr. Iyah "requested Ms. Blazin-Beavin [to] monitor her blood pressure at home and keep a blood pressure log[,]" she did not make any changes to Ms. Blazin-Beavin's medication or treatment regimen. Id. Less than a week later on January 24, 2017, Ms. Blazin-Beavin presented to UCFS, at which time "her blood pressure measured 155/78; no changes were made to her medication or treatment regimen." Doc. #14 at 10, ¶44.

---

[5] UCFS is a federally qualified health center. See Doc. #14 at 4, ¶17.

4

The following month, on February 27, 2017, Dr. Iyah evaluated Ms. Blazin-Beavin, at which time she complained of a headache, and her blood pressure was recorded as: 181/107; 190/120; and 174/120. See id. at ¶45. At this visit, "Dr. Iyah prescribed amlodipine 5mg, once daily." Id.

On March 6, 2017, Ms. Blazin-Beavin was evaluated by Dr. Iyah, at which time her blood pressure was recorded as 136/83 and 140/100. See Doc. #14 at 10, ¶46. On that date, Dr. Iyah increased Ms. Blazin-Beavin's Lisinopril prescription to 20 milligrams daily, but did not order any "additional work-up for other, secondary, causes of hypertension[.]" Id.

On July 5, 2017, Ms. Blazin-Beavin went to the "William Backus Hospital Emergency Department with complaints of heart racing ... headache ... nausea, tingling in left arm, and hypertension." See id. at 10, ¶47. Her blood pressure was recorded, during the course of that visit, as: 224/118; 205/123; 197/121; 189/117; 191/121; and 189/107. At discharge, Ms. Blazin-Beavin was instructed to follow-up with Dr. Iyah. See id.

As of July 10, 2017, Dr. Iyah was aware of Ms. Blazin-Beavin's Emergency Department visit, but did not see her after this date. See id. at 10-11, ¶49. Dr. Iyah did, however, refer Ms. Blazin-Beavin to a cardiologist "for further work-up." Doc. #14 at 10-11, ¶49. Ms. Blazin-Beavin met with the cardiologist

on July 27, 2017, who noted: "malignant hypertension ... [this] is a relatively young woman ... [reports] hypertension started approximately 2009 prior to that [has] been normotensive ... [no] secondary workup ever performed." Id. at 11, ¶50 (alterations in original).

On September 24, 2017, Ms. Blazin-Beavin suffered a stroke with brain bleed. See generally Doc. #14 at 11, ¶¶51-55. Shortly after arriving at the Backus Hospital Emergency Department, the neurological assessment of Ms. Blazin-Beavin "revealed a Glasgow coma scale of 9." Id. at 11, ¶53. At various times after her arrival, Ms. Blazin-Beavin's blood pressure was recorded as: 187/101; 242/107; 216/104; 208/101; and 220/103. See id. at 11-12, ¶¶56-60. Ms. Blazin-Beavin was eventually transported to Hartford Hospital to undergo emergency surgery; she arrived there shortly after midnight on September 25, 2017, by LIFE STAR helicopter. See id. at 12-13, ¶¶64-71.

On November 17, 2017, Ms. Blazin-Beavin was transferred to Middlesex Health Care Center ("MHCC") for continued medical care. See Doc. #14 at 13, ¶73. From that time, until her death on August 29, 2018, Ms. Blazin-Beavin was transported between MHCC and various hospitals for medical treatment, including for recurring seizure activity. See id. at 13-14, ¶¶74-80.

## III. <u>Standard of Law</u>

"[W]here the dates in a complaint show that an action is barred by a statute of limitations, a motion to dismiss based on the statute of limitations is properly treated as one under Rule 12(b)(6) rather than Rule 12(b)(1)." <u>Cangemi v. United States</u>, 13 F.4th 115, 134 (2d Cir. 2021) (citation and quotation marks omitted); <u>see also</u> <u>Mr. & Mrs. D. v. Southington Bd. of Educ.</u>, 119 F. Supp. 2d 105, 107 (D. Conn. 2000). ("When the basis for the motion to dismiss is the applicability of a statute of limitations, the motion is considered under the standard set forth in Rule 12(b)(6) of the Federal Rules.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted); <u>accord</u> <u>Kaplan v. Lebanese Canadian Bank, SAL</u>, 999 F.3d 842, 854 (2d Cir. 2021). In reviewing such a motion, the Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." <u>Kaplan</u>, 999 F.3d at 854.

"But while this plausibility pleading standard is forgiving, it is not toothless. It does not require [the Court] to credit legal conclusions couched as factual allegations or

naked assertions devoid of further factual enhancement." Mandala v. NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020) (citation and quotation marks omitted).

**IV. Discussion**

The United States contends that plaintiffs' claims against it are "'forever barred' under 28 U.S.C. §2401(b) because Plaintiffs failed to file them within two years after those claims accrued on September 24, 2017[,]" the date of Ms. Blazin-Beavin's stroke. Doc. #37 at 3-4. Plaintiffs, relying on the application of the discovery-diligence rule, assert that "any reasonable application of [that] rule during the Decedent's lifetime compels denial of the requested relief." Doc. #43 at 8; see also id. at 12-16. Thus, the Court first considers the question of when plaintiffs' claims accrued for purposes of the FTCA.

A. Accrual of a Claim, and the Diligence-Discovery Rule

The FTCA provides: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues[.]" 28 U.S.C. §2401(b).

"Federal law determines the date that an FTCA claim accrues. Typically, FTCA medical malpractice claims accrue at the time of injury." A.Q.C. ex rel. Castillo v. United States,

656 F.3d 135, 139 (2d Cir. 2011) (citations and quotation marks omitted).

> However, in cases such as this one, ... where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called "diligence-discovery rule of accrual" applies. Under this rule, accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause.

Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998) (citation, footnote, and quotation marks omitted); see also Roque v. United States, 676 F. Supp. 2d 36, 40 (D. Conn. 2009) (same).

"The rule focuses ... on [plaintiff's] knowledge of the facts of what injury occurred and whose actions caused that injury. In other words, the rule protects a plaintiff against ignorance of the fact of his injury or its cause, but not ignorance of his legal rights." Roque, 676 F. Supp. 2d at 40 (citation and quotation marks omitted). Notice to plaintiff "must be not of harm but of iatrogenic [doctor-caused] harm, though, ... not necessarily of negligent iatrogenic harm." Valdez ex rel. Donely v. United States, 518 F.3d 173, 178 (2d Cir. 2008) (citation and quotation marks omitted) (alteration added).

Additionally, "[b]ecause an FTCA case may be brought only against employees of the United States, the identity of the

tortfeasor is a critical element to the accrual of a claim." Roque, 676 F. Supp. 2d at 41 (citation and quotation marks omitted). Thus, the statute of limitations "begins to run 'when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause — whichever comes first.'" Donely, 518 F.3d at 173 (footnote omitted) (quoting Drazan v. United States, 762 F.2d 56, 59 (7th Cir. 1985)).

In sum, "[t]he diligence-discovery rule reflects that for FTCA purposes, a claim accrues when a diligent plaintiff discovers two things: (1) that he has been hurt, and (2) who has inflicted the injury." Roque, 676 F. Supp. 2d at 41.

B. Analysis

  *1. Diligence-Discovery Rule*

The United States asserts that "the pleadings in this case – which are accepted as true for purposes of this motion only – demonstrate that Plaintiffs' claims arose on September 24, 2017, but no administrative claim was ever filed against the United States until January 13, 2020." Doc. #37 at 7. The United States contends that plaintiffs' claims accrued on September 24, 2017, the date of Ms. Blazin-Beavin's stroke, because at that time, and under the diligence-discovery rule, plaintiffs were "armed

with sufficient facts to raise an alarm in a reasonable person that the probable cause of Mrs. Blazin-Beavin's stroke was connected to her providers' alleged failure to properly treat her hypertensive condition[.]" Id. at 8.

In relevant part, plaintiffs contend that there was no reasonable way for plaintiffs or Ms. Blazin-Beavin to have learned of (1) the iatrogenic cause at the time of Ms. Blazin-Beavin's stroke, or (2) that there was any government involvement in Ms. Blazin-Beavin's care prior to the stroke. See Doc. #43 at 12-13. Plaintiffs also assert that "as a matter of law ... the earliest date upon which the Court should find accrual of the FTCA claim[]" is May 10, 2018, the date Mr. Beavin was appointed guardian of Ms. Blazin-Beavin. Id. at 15-16.

The parties do not dispute that Ms. Blazin-Beavin's injury occurred on September 24, 2017; indeed that is explicitly alleged in the Amended Complaint. See Doc. #14 at 11, ¶51. However, the question of who inflicted that injury, and when plaintiffs first reasonably suspected government involvement, is not as clear. See Donely, 518 F.3d at 173; Roque 676 F. Supp. 2d at 41.

At the outset, the Court acknowledges that the nature of Ms. Blazin-Beavin's injury is not comparable to an incident

11

where the "who" is immediately known. For example, when a patient unexpectedly dies during a routine surgery performed at a Veterans Administration hospital, the government involvement is readily apparent.

Here, by contrast, although plaintiffs may have known that Ms. Blazin-Beavin's hypertension caused or contributed to the stroke, there is nothing to suggest that plaintiffs had any suspicions that Dr. Iyah's actions (or inactions) also contributed to that injury.[6] Indeed, the United States' motion largely focuses on plaintiffs' knowledge of Ms. Blazin-Beavin's hypertension and how that "increases one's risk of stroke." Doc. #37 at 98. The allegations of the Amended Complaint, however, taken in a light most favorable to plaintiffs, do not suggest that plaintiffs had any knowledge that the injury was the result of doctor-caused harm. To the contrary, for all plaintiffs were presumably aware, Ms. Blazin-Beavin was receiving regular, and appropriate, treatment for hypertension from Dr. Iyah in the years before the stroke. See, e.g., Roque, 676 F. Supp. 2d at 42 ("Even though in September 2005 Plaintiff knew the fact and immediate medical cause of Edward Roque's death, without the

---

[6] Plaintiffs allege, in pertinent part, that Ms. Blazin-Beavin's stroke was caused by Dr. Iyah's "failure to properly work-up, diagnose, and treat Annette Blazin-Beavin's" hypertension. Doc. #14 at 32, ¶152; see also id. at 30, ¶143.

context Plaintiff learned in January 2008 he had no basis to state that the BOP officials were negligent.").

When determining the date of accrual, the Court is to "determine when [plaintiffs] w[ere] told of or had reason to suspect that the injury [Ms. Blazin-Beavin] suffered related in some way to the medical treatment she received." A.Q.C., 656 F.3d at 142 (citation and quotation marks omitted) (alterations modified). On the current record, and drawing all reasonable inferences in favor of plaintiff, the Court cannot definitively conclude that plaintiff had "all the 'critical facts' of Mrs. Blazin-Beavin's injury[,]" on the date of her stroke, Doc. #45 at 3, or otherwise "had reason to suspect" that the stroke was "related in some way" to Dr. Iyah's treatment of her hypertension.[7] A.Q.C., 656 F.3d at 142.

---

[7] Although the Court does not reach, at this stage of the case, the precise date on which plaintiffs' claims accrued, it is persuaded by the "coma" cases that the claim did not accrue on September 24, 2017. See, e.g., Clifford by Clifford v. United States, 738 F.2d 977 (8th Cir. 1984); Washington v. United States, 769 F.2d 1436 (9th Cir. 1985). This line of cases generally holds that "the statute of limitations under the FTCA does not accrue for a plaintiff whose ability to perceive that the government injured him was destroyed by the government's negligent care until the plaintiff is affirmatively informed of the injury in a way he can understand, or until a guardian is appointed." Barren by Barren v. United States, 839 F.2d 987, 995 (3d Cir. 1988) (Becker, J., dissenting).

*2. Derivative Nature of Wrongful Death Claims*

Finally, the Court briefly addresses the United States' contention that plaintiffs' wrongful death claims are derivative of the medical malpractice claims.

In pertinent part, the United States asserts that because plaintiffs' wrongful death claims are derivative of the medical malpractice claims, "the decedent's claim accrued once, prior to death, and it did not re-accrue as an independent cause of action." Doc. #37 at 13. In making this argument, the United States acknowledges that "the Second Circuit has yet to directly address this issue, [and] circuit courts are split on the question of when a wrongful death claims accrues for purposes of the FTCA[.]" Id. at 12. Rather, the United States relies on a Connecticut Supreme Court case, which acknowledges the

> long line of cases holding that Connecticut's wrongful death statute does not create a new cause of action, independent of any claims that the decedent might have had during his or her life. Rather, the wrongful death statute merely allows the administrator of an estate to append to an already valid claim an additional element of damages consisting of costs associated with the decedent's death.

Soto v. Bushmaster Firearms Int'l, LLC, 202 A.3d 262, 294, cert. denied sub nom. Remington Arms Co., LLC, et al. v. Soto, 140 S. Ct. 513 (2019). Accordingly, the United States contends that that because plaintiffs' wrongful death claims are "derivative of Connecticut medical malpractice claims" the wrongful death

14

claims must have accrued on the date of Ms. Blazin-Beavin's stroke because "[t]hat is when Mrs. Blazin-Beavin's injury and its possible connection to the medical care she received was readily discernable." Doc. #37 at 14.

Plaintiffs respond: "[T]he very clear rule in the Second Circuit is that, in medical malpractice actions such as this one, the diligence-discovery rule operates to determine when an FTCA claim accrues." Doc. #43 at 16 (footnote omitted). Therefore, plaintiffs assert that "the Court need not engage in an analysis outside the diligence-discovery rule line of cases." Id. Despite this, plaintiffs then discuss a handful of cases finding that a wrongful death claim accrued at the time of the decedent's death. See id. at 16-19.

Although the Court is persuaded by the authority relied on by the United States, the Court does not reach this issue given plaintiffs' persuasive argument as to the applicability of the discovery-diligence rule to the question of accrual. Even assuming, without deciding, that the claim is derivative, such finding would not be dispositive to the Court's decision, because the Court has determined plaintiffs did not have "reason to suspect" that Ms. Blazin-Beavin's stroke was "related in some way" to Dr. Iyah's treatment of her hypertension at the time of the stroke. A.Q.C., 656 F.3d at 142.

15

Because the remainder of the United States' arguments would not result in the Court granting its motion, the Court does not address them here.

## V. Conclusion

Thus, for the reasons stated, the United States' Motion to Dismiss [**Doc. #37**] is **DENIED, without prejudice**, to reasserting at the summary judgment phase.

The United States shall file its answer to plaintiffs' Amended Complaint [Doc. #14] on or before **December 8, 2021.**

A revised Scheduling Order and Case Management Plan will issue separately.

It is so ordered at New Haven, Connecticut, this 24th day of November, 2021.

/s/
HON. SARAH A. L. MERRIAM
UNITED STATES DISTRICT JUDGE